**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

United States of America,

        Plaintiff,

v.

Aaron Lee Gant,

        Defendant.

File No. 12-cr-00061-1 (ADM/TNL)

**REPORT & RECOMMENDATION**

---

Surya Saxena and Carol M. Kayser, Assistant United States Attorneys, United States Attorney's Office, 300 South Fourth Street, Suite 600, Minneapolis, MN 55415 (for the Government); and

Katherine Menendez and Shannon R. Elkins, Office of the Federal Defender, 300 South Fourth Street, Suite 107, Minneapolis, MN 55415 (for Defendant).

---

This matter is before the Court, United States Magistrate Judge Tony N. Leung, on Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure (Docket No. 21) and Defendant's Pretrial Motion to Suppress Statements, Admissions, and Answers (Docket No. 23).

On April 23, 2012, a hearing was held on the motions. Assistant United States Attorney Surya Saxena appeared on behalf of the United States (the Government). Shannon R. Elkins appeared on behalf of Defendant. Testimony was presented and evidence received regarding Defendant's motions.

**I.**

Based upon the file and documents contained therein, along with testimony and exhibits presented, the undersigned Magistrate Judge makes the following:

**FINDINGS**

**A. Officer Safety Bulletin**

On December 29, 2011, Officer Mark Nelson, a twelve-year veteran of the St. Paul Police Department, received an officer safety bulletin broadcasted by Officer Chad Degree. (Tr. at 25, 27.) Officer Degree is a member of the gang unit and works with concerned citizens and informants. (Tr. at 27.) The bulletin advised officers of a black Chevrolet Monte Carlo with a specific license plate number driven by a black male. (Tr. at 28, 52-53.) The bulletin stated that the driver had a gun and may be heading towards Hastings, Minnesota. (Tr. at 28, 53.)

The next evening, while working an overtime detail at Xcel Energy Center, Officer Nelson received additional information regarding the bulletin from Officer Tim Moore, who works in the gang unit with Officer Degree. (Tr. at 30.) Officer Moore stated that he had gone to Hastings, spoke with a source regarding the person who normally drives the Monte Carlo—a white male, and suspected that this person was involved in the use or sale of methamphetamine. (Tr. at 31.) Officer Moore told Officer Nelson that his source was reliable and had "good info." (Tr. at 31-32.)

**B. Traffic Stop**

On the morning of December 31, 2011, just before 9:00 a.m., Officer Nelson was on routine patrol near Payne Avenue in the City of St. Paul, Minnesota, when he spotted

2

a Monte Carlo matching the description contained in the officer safety bulletin. (Tr. at 26, 36.) The Monte Carlo was driven by a black male accompanied by a white male passenger. (Tr. at 33.)

The Monte Carlo drove past Officer Nelson's squad car and continued westbound on Cook Avenue. (Tr. at 35-36.) Officer Nelson made a U-turn on Payne and began to follow the Monte Carlo. (Tr. at 36.) Within the first block, Officer Nelson radioed other officers to alert them of the situation and his location. (Tr. at 36-37, 65.) Officer Nelson continued to follow the Monte Carlo westbound on Cook, pacing the car's speed with his own. (Tr. at 40-41.) Between Desoto Street and Arkwright Street, Officer Nelson observed the Monte Carlo to be traveling between 35 and 37 miles per hour, thus exceeding the speed limit of 30 miles per hour. (Tr. at 40-41, 69.)

At the corner of Cook and Arkwright, there was a stop sign. (Tr. at 41.) Officer Nelson observed that the Monte Carlo did not come to a complete stop at the stop sign before turning left onto Arkwright. (Tr. at 41-42.) The Monte Carlo continued south on Arkwright and ultimately turned into a driveway. (Tr. at 43.) Officer Nelson activated the lights on his squad car, briefly turned on his siren, and pulled into the driveway behind the Monte Carlo. (Tr. at 43.)

Officer Nelson instructed the driver to shut the Monte Carlo off and stay in the car. (Tr. at 46; Gov't Ex. 3.) The driver exited the car and took off running. (Tr. at 47; Gov't Ex. 3.) Officer Nelson ran after the driver. (Tr. at 47; Gov't Ex. 3.) As the driver was running away, Officer Nelson observed a gun in the driver's waistband and yelled, "Drop it! Drop it!" (Tr. at 47; Gov't Ex. 3.) Officer Nelson then fired two shots. (Tr. at 47;

3

Gov't Ex. 3.)  Officer Nelson continued after the driver and yelled to other officers, "He's got a gun!"  (Gov't Ex. 3.)  Officer Nelson fired two more shots.  (Gov't Ex. 3.)

The driver was ultimately apprehended a few moments later, unhurt, and Officer Nelson identified him as the driver of the Monte Carlo.  (Tr. at 49-50; *see* Gov't Ex. 1; Def. Ex. 2; Docket No. 28 at 11.[1])  As he was walking back to his squad, Officer Nelson found the driver's gun in a backyard.  (*See* Def. Ex. 2; Docket No. 28 7-12.)  The driver's identity was determined to be that of Defendant.

### C. Interview with Defendant

Sergeant Jake Peterson of the St. Paul Police Department, along with his partner Sergeant Tom Bergren, interviewed Defendant around 10:30 a.m. on the day of his arrest.  (Gov't Ex. 1.)  The interview was recorded onto a DVD and received at the hearing as Government Exhibit 1.

After getting some general biographical information, including Defendant's age (29) and level of education (obtained his GED in 2003), Sergeant Peterson told Defendant that he was going to go through Defendant's rights using a form and Defendant should stop him if he had any questions.  (Gov't Ex. 1.)  Sergeant Peterson informed Defendant that (1) he had the right to remain silent and could refuse at any time to answer questions posed by a police officer; (2) anything he said could be used against him; (3) he had the right to an attorney and to have an attorney present during questioning; and (4) if he could not afford attorney, one would be appointed to represent

---

[1] Defendant's Ex. 2 is a DVD recording of Officer Nelson's interview with Sergeants Peterson and Bergren.  At the hearing, while the parties agreed that the recording was the best evidence of the interview, they also agreed to file a transcript of the interview for ease of reference.  (*See* Tr. at 57, 71-73; Docket No. 28.)

him and he could remain silent until he had a chance to talk with the attorney. (Gov't Ex. 1.) After each statement, Defendant initialed next to the corresponding statement on the form. (Gov't Exs. 1; 2.) Finally, Defendant signed at the bottom of the form, indicating that the rights were read to him and that he understood them. (Gov't Exs. 1; 2.) A copy of Defendant's signed form was received as Government Exhibit 2 at the hearing.

Defendant then gave his account of what had happened. (Gov't Ex. 1.) At no time during the approximately 45-minute interview did Defendant ask for an attorney. (Gov't Ex. 1.)

### D. Critical Incident Interview & Investigation

Because Officer Nelson had fired his service weapon, he was interviewed a few hours later pursuant to the St. Paul Police Department's "critical incident" policy in lieu of preparing a written report. (Tr. at 18-19, 48; *see* Def. Ex. 2.) Prior to the interview, Office Nelson was given an opportunity to review the video[2] from his squad car and speak with an attorney. (Tr. at 52.)

Sergeants Peterson and Bergren interviewed Officer Nelson around 12:30 p.m. on December 31. (Def. Ex. 2; Docket No. 28 at 1, 15.) Sergeant Bergren asked Officer Nelson to explain what happened. (Def. Ex. 2; Docket No. 28 at 2.) Officer Nelson's statements focused on the shooting and the morning's events. (Def. Ex. 2; Docket No. 28 at 3-8.) In addition, Officer Nelson explained that he had chosen not to stop the Monte Carlo until back-up officers were in place out of concern for his own safety. (Def. Ex. 2; Docket No. 28 at 5.) During his interview, Officer Nelson did not mention the observed

---

[2] This video was submitted into evidence at the hearing as the Government's Exhibit 3.

speeding or failure to come to a complete stop. (Tr. at 55-56; *see* Def. Ex. 2; Docket No. 28.)

On January 31, 2012, Officer Nelson spoke with Officer Degree, the officer who had originally broadcast the officer safety bulletin, and Special Agent Erin Dockter of the Bureau of Alcohol, Tobacco, Firearms and Explosives. (Tr. at 60-62.) Officer Nelson discussed the critical incident again. (Tr. at 62.) The focus of their questioning was on the traffic stop, and Officer Nelson mentioned the speeding and failure to come to a complete stop. (Tr. at 61-62.)

### E. Hearing Testimony

At the hearing, the Government called Sergeant Peterson and Officer Nelson to testify. (*See* Tr. at 2.)

Sergeant Peterson testified that he had 15 years of experience, 12 of which were spent in St. Paul. (Tr. at 7-8.) Sergeant Peterson testified that, as part of the homicide and robbery unit, he investigates incidents of officer-involved shootings. (Tr. at 7-8.) In regards to this case, Sergeant Peterson stated that he collected and reviewed reports from all of the officers who reported to the scene, totaling approximately 75 pages, and viewed seven squad videos. (Tr. at 19-21.) Sergeant Peterson did not recall reading anything about specific traffic violations in the reports. (Tr. at 21.)

Sergeant Peterson testified that, when he interviewed Defendant, he used a standardized form to go through Defendant's *Miranda* rights with him. (Tr. at 9, 11, 14; *see* Gov't Ex. 1, 2.) Sergeant Peterson stated that Defendant never appeared uncomfortable or asked for the interview to stop. (Tr. at 16.) Sergeant Peterson also

6

testified that Defendant did not ask for an attorney, there was no sign that Defendant was under the influence of a controlled substance, and Defendant seemed mentally competent. (Tr. at 16-17.)

Officer Nelson testified that he has 12 and one-half years of experience as a police officer. (Tr. at 25.) He testified that failing to come to a complete stop at a stop sign and fleeing a police officer on foot are violations of Minnesota law. (Tr. at 41-42, 47-48.) He also testified that the Monte Carlo exceeded the speed limit. (Tr. at Tr. at 40-41.) In addition to recounting the above events, Officer Nelson testified that, based on Officer Degree's bulletin, he inferred the driver of the Monte Carlo was an individual ineligible to possess a gun. (Tr. at 26-27, 29-30, 32-47.)

Officer Nelson described how his squad-car recording system worked. (Tr. at 44.) Officer Nelson explained that certain events trigger the recording system, including when an officer activates his emergency lights. (Tr. at 44.) Officer Nelson testified that once a triggering event occurs, the squad video captures the 30 seconds prior to the event without audio and, from that point forward, both audio and video are captured. (Tr. at 44.)

Officer Nelson also discussed his radio habits. He testified that when encountering a vehicle that is subject to a safety bulletin, he gets on the air right away out of concern for his own safety and in order to get more officers in the area. (Tr. at 37-38.) In contrast, when performing a routine traffic stop, he just calls in his location, squad number, and the plate number of the stopped vehicle. (Tr. at 39.) Officer Nelson

7

testified that, with regard to routine misdemeanors and traffic violations, officers do not call in the type of violation that prompted the stop. (Tr. at 39.)

Officer Nelson also acknowledged that he did not tell Sergeant Peterson about the traffic violations. (Tr. at 57, 59-60.) He testified that, at the time of his interview, he was more focused on his use of his service weapon. (Tr. at 60.) Officer Nelson knew a prosecutor would be reviewing his actions and wanted to justify his use of deadly force. (Tr. at 60, 68.) Officer Nelson stated that he was not asked about the stop itself during the interview. (*See* Tr. at 57, 58-60, 68.) On cross examination, however, he acknowledged that most of the interview was in the narrative. (Tr. at 57.) Having been involved in a prior critical incident, Officer Nelson also testified that a person does not remember all of the details of what occurred immediately following the incident. (Tr. at 49.) Officer Nelson testified that the interview process does not allow him to "proof" his account of what happened as he would typically be able to do with a written report. (Tr. at 68.)

Defendant called St. Paul Police Officer Jeff Cragg as a witness. (*See* Tr. at 2, 74.) Officer Cragg testified that, on December 31, he responded to a "10-3" call from Officer Nelson, a code signaling an emergency situation. (Tr. at 75-76.) Officer Cragg testified that he responded to the scene and saw Officer Nelson pointing his service weapon at the driver and yelling commands to the driver. (Tr. at 76-78.)

8

**II.**

Based upon the foregoing Findings, the undersigned Magistrate Judge makes the following:

**CONCLUSIONS OF LAW**

The Fourth Amendment of the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ."  U.S. Const. amend. IV.

> A traffic stop constitutes a seizure for Fourth Amendment purposes.  To constitute a reasonable seizure, a traffic stop must be supported by, at a minimum, a reasonable, articulable suspicion that criminal activity is occurring.  A traffic violation, however minor, provides probable cause sufficient to satisfy the constitutional reasonableness requirement.

*United States v. Frasher*, 632 F.3d 450, 453 (8th Cir. 2011) (quotations and citations omitted).  Notably, "[e]ven if [the officer was] mistaken about the existence of a violation, 'the validity of a stop depends on whether the officer's actions were objectively reasonable in the circumstances.'"  *United States v. Martin*, 411 F.3d 998, 1001 (8th Cir. 2005) (quoting *United States v. Smart*, 393 F.3d 767, 770 (8th Cir. 2005)); *see also United States v. Herrera-Gonzalez*, 474 F.3d 1105, 1109 (8th Cir. 2007) ("Even if the officer was mistaken in concluding that a traffic violation occurred, the stop does not violate the Fourth Amendment if the mistake was an objectively reasonable one." (quotation omitted)).

Defendant argues that Officer Nelson did not observe any traffic violations prior to the stop and that he simply made a determination that he was going to stop the Monte

9

Carlo because it matched the description of the car in the safety bulletin aired by Officer Degree. (Mem. in Supp. at 11 (Docket No. 29).) Further, Defendant contends that an objectively reasonable officer under these circumstances would not have reasonable articulable suspicion of criminal activity to warrant an investigatory stop. (Mem. in Supp. at 12-14.) Defendant asserts that, because the stop did not fall within the permitted exceptions to the Fourth Amendment's probable cause and warrant requirements, this Court should suppress the gun, his statements to Sergeants Peterson and Bergren, and any other evidence obtained as the fruits of an illegal stop. (*See* Mem. in Supp. at 10-18.)

The Government opposes the motion and contends that the totality of the circumstances are such that a reasonable officer would have had a reasonable suspicion of criminal activity and, even if the stop was not supported by reasonable suspicion of criminal activity, Defendant's subsequent flight from the scene of the stop provided an independent basis for Defendant's arrest. (Mem. in Opp'n at 1 (Docket No. 31).)

**A. Traffic Violations**

Under Minnesota law, it is unlawful to drive in excess of "30 miles per hour in an urban district." Minn. Stat. § 169.14, subd. 2(1). Officer Nelson testified that the unposted speed limit in this area of St. Paul was 30 miles per hour and that he, a police officer with approximately 12 years of experience, observed Defendant traveling between 35 and 37 miles per hour by pacing the Monte Carlo with his squad car, measuring the car's speed against his own speedometer. The Court finds Officer Nelson's testimony credible concerning the perceived speed of the Monte Carlo based on his comparison of the car's speed with his own. The Court concludes that Officer Nelson's conclusion that

a traffic violation had occurred was objectively reasonable under the circumstances and, therefore, Officer Nelson had probable cause to stop the Monte Carlo.

Minnesota law also requires that "[e]very driver of a vehicle . . . stop at a stop sign or at a clearly marked stop line before entering the intersection, except when directed to proceed by a police officer or traffic-control signal." Minn. Stat. § 169.30(b); *see also State v. Doty*, No. A09-1763, 2010 WL 2813402, at *1-2 (Minn. App. July 20, 2010) (concluding officer had reasonable suspicion to stop vehicle where vehicle slowed but did not come to a complete stop at two stop signs). Officer Nelson testified that the Monte Carlo did not come to a complete stop at the stop sign at the corner of Cook and Arkwright before turning left onto Arkwright. The Court finds Officer Nelson's testimony credible and, therefore, the Court concludes that, by failing to come to a complete stop at a stop sign, Defendant committed a traffic violation and Officer Nelson had probable cause to stop the Monte Carlo.

Even assuming arguendo, as Defendant contends, that Officer Nelson determined that he was going to stop the Monte Carlo as soon as he realized that the car matched Officer Degree's safety bulletin, this subjective motivation did not invalidate the stop. The traffic violations provided probable cause to stop the Monte Carlo notwithstanding any suspicions of criminal activity that Officer Nelson had prior to the stop based on the safety bulletin. *See United States v. $231,930.00*, 614 F.3d 837, 842 (8th Cir. 2010) (officer's subjective suspicions of other illegal conduct did not invalidate stop as any traffic violation provides probable cause to stop); *United States v. Lopez*, 564 F.3d 1001, 1003-04 (8th Cir. 2009) (although trooper had followed car for a half mile, any subjective

11

desire to stop car was not relevant to whether trooper had probable cause to stop car for traffic violation).

> As the Eighth Circuit has explained:
>
>> Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis. We have repeatedly held that any traffic violation, however minor, gives an officer probable cause to stop a vehicle. Once an officer has probable cause, the stop is objectively reasonable and any ulterior motivation on the officer's part is irrelevant. It is similarly irrelevant that the officer may have ignored the violation were it not for a suspicion that greater crimes are afoot.

*United States v. Arciniega*, 569 F.3d 394, 397 (8th Cir. 2009) (quotations and citations omitted).

Further, this Court credits Officer Nelson's testimony that he did not initially remember, and therefore did not discuss, the traffic violations during his interview with Sergeants Peterson and Bergren due to his heightened focus on the shooting and events that occurred after the stop. Officer Nelson was keenly aware that he was under investigation for discharging his service weapon and understandably preoccupied with what occurred *immediately before* the shots were fired. It is very credible and easily well within the realm of reason that his focus during the interview was not on the details of the traffic stop.

This Court also concludes that, at the time of his interview, Officer Nelson's recall of the morning's events was affected by the intense and stressful nature of having fired his service weapon at another human being. Officer Nelson was interviewed approximately three hours after he first spotted the Monte Carlo. He was asked to "start

12

from the beginning" and provide his own "narrative of what happened today." (Def. Ex. 2; Docket No. 28 at 2.) He was not specifically asked whether any traffic violations had occurred. A month later, when he was in a relative state of calm, Officer Nelson was specifically asked by Officer Degree and Special Agent Dockter whether he had observed any traffic violations. The Court finds it neither incredible nor surprising that, upon reflection, Officer Nelson was able to articulate additional details about the stop, especially since those details were not directly connected to his decision to discharge his service weapon.

When viewed as a whole, Officer Nelson's interview, testimony, and squad video tell a coherent, facially plausible, and internally consistent story. The traffic violations were not captured on the squad video because the video did not start recording until Officer Nelson activated his emergency lights, which occurred approximately four blocks away from where the violations occurred. None of the other officers' reports concerning the events of that day discussed any traffic violations because Officer Nelson was the only officer to observe them. Moreover, there is no extrinsic evidence contradicting Officer Nelson's testimony. *Cf. United States v. Prokupek*, 632 F.3d 460, 463 (8th Cir. 2011) (concluding trooper's testimony at suppression hearing was implausible on its face when it was directly contradicted by contemporaneous squad car video).

"The mere fact an incident report omits certain details is not sufficient to render the officer's testimony concerning the underlying action facially implausible." *United States v. Mendoza*, ___ F.3d ___, 2012 WL 1660949, at *4 (8th Cir. May 14, 2012). The mere fact that Officer Nelson's testimony included additional details not in his "oral

13

report"/interview is of no moment, and neither diminishes his credibility nor the facial plausibility of his account of the events. Therefore, this Court concludes that the traffic violations observed by Officer Nelson supplied probable cause for the stop and the stop was objectively reasonable.

### B. Probable Cause to Arrest

The Court next turns to the Government's probable cause to arrest Defendant. The Government argues that Defendant's "decision to flee from Officer Nelson and refuse to comply with his orders provided an independent basis for police to pursue and arrest [Defendant], which led to the discovery of his gun and his arrest." (Mem. in Opp'n at 1.)

"A warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed." *United States v. Jones*, 535 F.3d 886, 890 (8th Cir. 2008) (quotation omitted). "An officer has probable cause to make a warrantless arrest when the facts and circumstances are sufficient to lead a reasonable person to believe that the defendant has committed or is committing an offense." *United States v. Torres-Lona*, 491 F.3d 750, 755 (8th Cir. 2007). An actual showing of criminal activity is not required; "[t]here need only be a probability or substantial chance of criminal activity." *Id.* at 756 (quotation omitted). "Importantly, a defendant's response to even an invalid arrest or *Terry* stop may constitute independent grounds for arrest." *United States v. Blackmon*, 662 F.3d 981, 985-86 (8th Cir. 2011) (quotation omitted).

Under Minnesota law, "[w]hoever, for the purpose of avoiding arrest, detention, or investigation, . . . attempts to evade or elude a peace officer, who is acting in the lawful

14

discharge of an official duty, by means of running [or] hiding . . . is guilty of a misdemeanor." Minn. Stat. § 609.487, subd. 6. After Officer Nelson pulled into the driveway behind the Monte Carlo, he instructed Defendant to turn off the car and stay inside the car; instead of obeying Officer Nelson's commands, Defendant exited the car and ran away from Officer Nelson.

Defendant's failure to follow Officer Nelson's commands and flight from the scene are sufficient for a reasonable person to believe that Defendant was committing the offense of fleeing a peace officer and thus provided independent probable cause to arrest Defendant. *See Blackmon*, 662 F.3d at 986 (where defendant refused to obey officer commands and raised his fists as if preparing to fight, officer had probable cause to arrest defendant for resisting arrest); *see also Hill v. Scott*, 349 F.3d 1068, 1074 (8th Cir. 2003) ("In Minnesota, there is a right to resist an unjustified bodily attack (a.k.a. excessive force) by an officer, but there is no right to resist an unlawful search or arrest."). Therefore, Defendant's arrest was proper because his behavior following the stop would lead a reasonable person to believe that he was committing a crime.

### C. Evidence Obtained

As for the evidence obtained, "[a] warrantless search of abandoned property does not implicate the Fourth Amendment, for any expectation of privacy in the item searched is forfeited upon its abandonment." *United States v. Tugwell*, 125 F.3d 600, 602 (8th Cir. 1997). Once Defendant dropped the gun in the backyard and continued running, the gun, and any other property dropped by Defendant during his flight, was abandoned and Defendant relinquished any reasonable expectation of privacy in the property. *See*

*United States v. Warren*, 221 F.3d 1345 (Table) (8th Cir. 2000) (defendant objectively relinquished any reasonable expectation of privacy in duffle bag after hanging it on a stranger's fence and walking away).

With respect to Defendant's statements, the Fifth Amendment right against self-incrimination "dictates that *Miranda* warnings be given when interrogation is initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *United States v. Huether*, 673 F.3d 789, 794 (8th Cir. 2012) (quotation omitted). "[A] suspect in custody "must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *United States v. Cajas-Maldonado*, 13 Fed. App'x 469, 473 (quoting *Miranda v. Arizona*, 384 U.S. 436, 444 (1966)). "In order for a confession obtained during a custodial interrogation to be admissible, the defendant must have knowingly, voluntarily, and intelligently waived his *Miranda* rights." *Id.* Whether these rights have been knowingly, voluntarily, and intelligently waived is based on the totality of the circumstances. *Id.* at 474.

Sergeant Peterson informed Defendant of his *Miranda* rights by reading to him a standardized form. Defendant initialed after each right as it was read to him thereby indicating that he understood the right. Defendant also signed the form, indicating that he understood his rights. During this process, Defendant appears coherent and aware of what is going on. (Gov't Ex. 1.) The Court concludes that Defendant knowingly, voluntarily, and intelligently waived these rights.

Because Defendant was lawfully arrested and knowingly, voluntarily, and intelligently his *Miranda* rights, Defendant's incriminating statements were given freely and not the product of any Fourth Amendment violation.[3] *See United States v. Bourrage*, 358 Fed. Appx. 776, 780 (8th Cir. 2010).

[Continued on next page.]

---

[3] Defendant initially moved to suppress any statements, admissions, or answers on the basis that such statements were (1) made without the assistance or benefit of counsel in violation of his Fifth and Sixth Amendment rights, and (2) not freely and voluntarily given, thereby violating the Fifth Amendment. (Docket No. 23 at 1-2.) In his supporting memorandum filed on May 7, 2012, Defendant relies solely on a Fourth-Amendment analysis, contending this evidence was obtained as a result of an illegal stop. (*See* Mem. in Supp. at 1, 15-18.)

## III.

Based upon the foregoing Findings and Conclusions, the undersigned Magistrate Judge makes the following:

## RECOMMENDATION

For the reasons set forth herein, **IT IS HEREBY RECOMMENDED** that:

1. Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure (Docket No. 21) be **DENIED**.

2. Defendant's Pretrial Motion to Suppress Statements, Admissions, and Answers (Docket No. 23) be **DENIED.**

Date: May   22   , 2012                              *s/ Tony N. Leung*
                                                     Tony N. Leung
                                                     United States Magistrate Judge
                                                     for the District of Minnesota

                                                     *United States v. Gant*
                                                     File No. 12-cr-00061-1 (ADM/TNL)

Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties, written objections which specifically identify the portions of the Report to which objections are made and the bases for each objection. This Report and Recommendation does not constitute an order or judgment from the District Court and it is therefore not directly appealable to the Circuit Court of Appeals. Written objections must be filed with the Court before **June 6, 2012**.

Unless the parties stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve all objections made to this Report and Recommendation, the party making the objections shall timely order and file a complete transcript of the hearing within ten days of receipt of the Report.